Petition of the CITY OF DES MOINES for Confirmation of Assessments and Valuations for the South Urban Area "C" Sanitary Sewer.

Marian BROWN et al., Appellants,

v.

CITY OF DES MOINES, Iowa, Appellee and Cross-Appellant.

No. 57066.

Supreme Court of Iowa.

Sept. 22, 1976.

Rehearing Denied Nov. 8, 1976.

included in the area filed objections to the proposed valuations of and assessments against their properties. Appellants are objectors who challenge the trial court's determination of such valuations and assessments. The City cross-appeals from a reduction of two of the assessments and valuations.

September 24, 1973, the Des Moines City Council passed a final resolution of necessity and made and approved a schedule of assessments and valuations for the construction of a sanitary sewer, a sanitary lagoon and storm water lagoon with the necessary treatment facilities. September 27 the City filed a petition with the district court requesting that a hearing be set and steps taken to confirm the levy of special assessments made by it for such improvements. The court set a pretrial conference in the matter for October 22 and trial for October 23. (The transcript indicates, however, trial actually commenced November 1).

There were two main portions of the project, namely, the "North Yeader Creek Outfall Sewer" which ran along the southern edge of the project, and the "Hartford Trunk," generally in the northern portion of the project area. Included in the Hartford Trunk were the "North Subtrunk" and the "South Subtrunk." The plans also called for certain storm treatment facilities, the cost of which was not assessed against real estate in the area.

The area the sewer project encompassed, while relatively close-in to downtown Des Moines, has remained undeveloped in connection with residential uses. Some of the land is farmed but other portions are unsuitable for agriculture due to wetness. Electricity is the only utility available to much of the land. Municipal water is not provided objectors' land, and it was adduced during trial Iowa Light and Power Company has filed a tariff regulation with the Iowa State Commerce Commission which precludes the extension of natural gas utilities. The City, however, determined construction of sewer facilities was necessary.

· Duncan, Jones, Riley & Finley and Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for appellants.

William D. Groteluschen and Ahlers, Cooney, Dorweiler, Allbee, Haynie & Smith, Des Moines, for appellee and cross-appellant.

Heard before MOORE, C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

MASON, Justice.

The City instituted proceedings under Chapters 391 and 417, The Code 1973, seeking confirmation of valuations and assessments in connection with a proposed sanitary sewer project in southeast Des Moines designated as South Urban Area "C" Sanitary Sewer. Several owners of real estate

Total construction cost of the project was $1,880,860.00. The federal government granted funds of $1,283,591.53 to defray costs. Thus, some $560,000 of the cost was to be borne by the area private property owners. The trial court found some 529.38 acres were served by the Hartford Trunk, the cost per acre being "$975.86 plus", subject to limitations due to the city council's land valuations. The north and south sub-trunks of the Hartford Trunk serve 402.93 acres. The per acre cost of the subtrunks was assessed at $321.67 in addition to which was a $2.50 per foot "frontage benefit factor" charged to land abutting the portion of a subtrunk having a diameter of 12 inches or less. The North Yeader Creek Sewer, likewise, serves 456.58 acres (within the city limits). The cost per acre was assessed at "$1,043.11 plus", subject again to valuation limitations.

The city council's "valuation committee" assumed the task of calculating land values. The values reached, plus the consequent assessments, serve as bases of the present dispute. The committee's determinations are far in excess of two private assessors' appraisals of the Brown and Hethershaw properties and, apparently, of the tax assessors' valuations. In this connection objectors attack the committee's valuation methods as well as the conclusion the highest and best use of the lands was residential. These arguments will be discussed later.

The private assessors who testified at trial were Robert B. Metier and Paul Murray Work. Both men were well qualified in the real estate field. Their extensive testimony obviously had some effect as the trial court reduced the valuation committee's determinations on five properties. In any event, the record reveals the following valuation and assessment figures and land descriptions:

A. Marian Brown and Cecilia Brown Franklin own 212.64 acres subject to assessment. Of this real estate, 69.58 acres are tillable, 60 acres are questionable pasture land and 83 acres are apparently timberlands which do not produce income. The monetary figures are:

1. Tax assessment valuation _____ $ 73,940.00 (tax payable in 1973)
$ 67,470.00 (tax payable in 1974)
(These amounts may include more than the 212 acres, appendix, pp. 112–113).
2. City committee valuation _____ $512,891.00 with sewer
3. Trial court valuation _____ $349,444.00 with sewer
4. Metier valuations—
 a. market data approach _____ $ 99,000.00 without sewer
$106,500.00 with sewer
 b. cost approach _____ same as market data
 c. income approach _____ $ 60,000.00
5. Work valuations _____ $106,500.00 without sewer
$115,000.00 with sewer
6. City committee assessment _____ $128,222.50
7. Trial court assessment _____ $ 87,361.50

B. The estate of Carrie Hethershaw consists of 78 acres subject to assessment, of which 57 acres are tillable farmland. The various figures are:

1. Tax assessment valuation _____ $ 23,360.00 (1972)
 (with buildings) $ 16,910.00 (1973)
2. Committee valuation _____ $216,000.00
3. Trial court valuation _____ $144,107.00

4. Metier valuations—
 a. market data approach _____$ 37,000.00 (without sewer including buildings)
 b. cost approach _____$ 42,000.00 (without sewer including buildings)
 $ 50,200.00 (with sewer)
 c. income approach _____not applicable
5. Work valuations _____$ 39,000.00 without sewer
 $ 40,500.00 with sewer
6. City committee assessments _____$ 54,527.50
7. Trial court assessment _____$ 36,026.75

C. Ethmer S. Carter and his wife, Grace, own approximately 36 acres of farmland. Metier and Work did not appraise the property.

1. City committee valuation _____$106,870.00
2. Trial court valuation _____$ 72,291.00
3. City committee assessment _____$ 26,717.50
4. Trial court assessment _____$ 18,072.75

D. The real estate of objectors Resler and Davis was valued by the city committee at $38,280.00 and $33,960.00, respectively. The Davises were assessed $8,490.00 and the Reslers, $9,570.00. (Exhibits K–2 and K–3). The trial court left these determinations untouched.

The parties frame the issues presented for review in the following fashion:

(1) Were objectors Hethershaw and Carter precluded from raising valuation issues due to their failure to object at the city council hearing on the resolution of necessity for the sewer project? (Raised on City's cross-appeal).

(2) Did objectors preserve the issue presented by *Heins v. City of Cedar Rapids*, 231 N.W.2d 16 (Iowa 1975) and thus section 441.21 in district court or on appeal?

(3) Were assessment procedures followed by the City's valuation committee improper and contrary to provisions of the Code and thus invalid?

(4) Is the highest and best use of the real estate of objectors Brown, Hethershaw and Carter agricultural? If so, were the assessments greatly in excess of the benefits conferred?

I. Discussion of the waiver issue necessarily entails recitation of the procedural facts. Following planning to construct the sewer, Mr. E. E. Kalsow, Chief Clerk in the Department of Public Works of the City of Des Moines, caused to be delivered or posted "Notice of Hearing on Resolution of Necessity for sewer improvements" pursuant to section 417.9, The Code, 1973. The same notice was also sent by certified mail to landowners in the area. These events occurred August 10 and 8, respectively. The notice informed landowners the city council had scheduled a hearing on the resolution for September 4, 1973, for the purpose of considering objections. It was further provided:

"You are further hereby notified that unless property owners at the time of final consideration of this resolution have on file with the City Clerk objections to the amount of the proposed assessments, * * [and] unless [these objections are] made before the City Council at said time and in the manner required by law, they shall be deemed to have waived all objections thereto, except where fraud is shown."

September 24 the resolution was passed by the council and signed by the mayor. The record indicates objections were not voiced by objectors.

September 27 the notices concerning the pretrial conference and court hearing on

the sewer project were mailed. The notices further provided:

"All persons having objections to the Schedule of Assessments and Valuations * * * shall present any such objections in writing to the said District Court on or before the date for such pretrial conference, otherwise all objections to the said Schedule of Assessments and Valuations, * * * shall be deemed waived."

From October 17–30 the objectors' answers and objections were filed. The answers of the Carters, Davises and Reslers adopted various portions of the Brown answer. Thereafter, on October 31, the City answered, countering several objections of the Davises, Carters, Reslers and Hethershaws were waived due to their failure to earlier file objections with the city council.

In connection with the City's contentions, Hethershaw filed a motion to adjudicate law points on the issue of waiver pursuant to rule 105, Rules of Civil Procedure. The trial court felt it could not, on the first day of trial, adjudicate law points "since this * * * [was] the date previously set for hearing on the Petition itself, in other words, for trial of the case * * *."

During trial those objectors who desired to do so were afforded opportunity to present evidence. In its "Memorandum Opinion," filed December 4, 1973, the trial court held only the Browns, Carters, Fischers, Hethershaws and Esteys had sustained their burden of proof. No mention is made of the City's waiver contention.

The City maintains the contention was raised in its reply that Hethershaw and Carter waived their right to object to the resolution of necessity and specifically to the valuation of their properties by reason of their failure to object on said ground (or any ground) at the hearing before the city council.

On the other hand, the objectors who are appellants in this matter contend they had the right to first object, if they desired, at the district court level. In support of their position they rely on sections 417.36 and 417.37.

All references in this opinion to various sections of chapters 391 and 417 are to those appearing in the 1973 Code, which have since been repealed. See Second Session of the Sixty-fourth General Assembly, chapter 1088, section 199.

Section 417.36 as then in force provided:

"Petition—procedure. Upon the filing of such petition, the city solicitor shall verify the fact that due notice has been given of the time and place of the hearing upon said petition. Any such petition shall have precedence over any other business of the court, except in criminal cases, and said court shall set the said petition for hearing within thirty days from the date that it is filed with the clerk of said court."

Section 417.37 as then in force provided:

"Power of court. Upon the hearing upon said petition, the said court shall have power to correct any irregularities or inequalities in valuations or in the schedule of assessments, and shall consider any objections because of alleged illegal procedure or fraud in the proceedings.

"The court shall inquire whether the city solicitor has omitted any property benefited, and as to whether the schedule of assessments is just and equitable as between the public and the property assessed, and between the lots or parcels of property assessed.

"The court shall have the power to revise, correct, or modify the description or the cost between the properties affected, or the city solicitor shall make any corrections upon the order of the court."

The issue presented may be phrased: Is objection to the city council at a section 417.15 hearing a condition precedent to the right to later file objections with the district court?

The City's contention objectors were obliged to file objections to the city council is premised upon section 391.19, The Code, which in relevant part reads:

"The council may * * * provide that unless property owners at the time of the final consideration of said resolution have

on file with the clerk objections to the amount of the proposed assessment, they shall be deemed to have waived all objections thereto."

It must be conceded that but for the fact notice to landowners of the council meeting contained the waiver provision envisioned by section 391.19 the City followed the procedures set forth in chapter 417 in conducting its street and sewer projects. There is no provision in chapter 417 allowing the city council to require objections before that body before one may object before the district court. However, the City argues chapter 417 is a procedural chapter and makes reference to the general law of the state as contained in chapter 391 for numerous matters of substance and procedure which are not specifically covered within the provisions of chapter 417. The City insists section 417.70 in so many words carries chapter 391 requirements into chapter 417. That section provided:

"417.70 General procedure. All necessary proceedings, forms, and requirements not included in or contemplated or regulated by the provisions hereof, shall be in accordance with the provisions of the general law of the state relating to the same subject matter, including definitions and regulations relating to valuations, benefited property, estimates, assessments, plans, specifications, schedules, resolutions, protests, [or] objections, * * *."

Section 417.74 further provided the procedure prescribed in chapter 417 "* * * shall not be exclusive of any other method prescribed by law for the special assessment of public improvements in cities."

The court is referred to *Moss v. Incorporated Town of Hull*, 249 Iowa 1178, 1181–1182, 91 N.W.2d 599, 601, a case dealing with chapter 391. It was therein held: "* * * all matters pertaining to the boundaries, the streets to be improved, the width thereof, the list of lots to be assessed *and the value thereof* * * *, are to be finally determined at the time the resolution of necessity is adopted, and a failure to object at that time constitutes a waiver thereof." (Emphasis supplied).

It is apparent *under chapter 391* where one is given notice that he will waive objections by not complaining to the city council, he does just that by failing to object. The question is whether this requirement logically carries over to chapter 417 proceedings. Examination of both chapters compels the conclusion failure to object before the city council should not constitute a waiver under chapter 417. The logic of this conclusion turns upon the role of the district court under both chapters. Section 391.88 provides a person affected by the levy of a special assessment *may* appeal to the district court. If such a landowner does not appeal, the district court does not inject itself into the assessment process.

The procedure established in chapter 417 "* * * differs in various respects from that provided by other special assessment statutes of this state. Among other things it requires a review by the court of the proceedings of the city, and notice thereof to all persons interested in the real estate proposed to be assessed. The proposed assessments are not effective unless and until they are confirmed by the court upon such review. It may be noted this statute does not provide for separate appeals to the district court permitted by other special assessment statutes. However, it requires this one trial or review in which all interested persons are made parties." *In re City of Des Moines*, 240 Iowa 64, 68, 35 N.W.2d 571, 573.

It does not seem reasonable the legislature intended to tie the hands of the district court in the situation where landowners have not objected before the city council. The exercise of the powers given the court—correction of irregularities in valuations or assessments, the consideration of objections concerning illegal or fraudulent procedures, inquiry into whether there has been omission of benefited property from assessment and others—should not be constricted. True, section 417.43 provides for "peremptory confirmation" in the event there are no objections. On the other hand, however, the *required* confirmation hearing, regardless of the merits of objections,

would be a mere rubber stamp of council action should the city's interpretation be accepted by this court. The notion the legislature would mandate that this equitable proceeding always be held but at the same time intend a strict waiver rule be implemented when landowners do not file objections with the council is not persuasive.

We hold objection to the city council at a section 417.15 hearing is not a condition precedent to the right to later file objections with the district court in such proceedings. Consequently, Hethershaw and Carter were not precluded from raising valuation issues by reason of their failure to object at the city council hearing on the resolution of necessity for the sewer project.

II. The City presents a second aspect of waiver to this court. Objectors, in supplemental brief, rely upon *Heins v. City of Cedar Rapids*, 231 N.W.2d 16 (Iowa 1975). *Heins* was decided subsequent to any of the events which culminated in this appeal and could well be dispositive of the issues herein. Yet, the City asserts the issue determined in that case has not properly been raised in the present one.

Objectors' initial brief does not raise the issue decided in *Heins*, namely, whether the value of agricultural property must be determined under section 441.21, The Code, wherein it is provided only current and not future or potential uses of agricultural property may be considered in determination of value. As the City points out, objectors first rely upon the valuation committee's failure to consider the tax assessment rolls, as well as the committee's addition of the cost of "a" sewer to determine added value to the property. The second issue presented asserts the highest and best use of the real estate is for agriculture.

Objectors, in reply brief, do not meet the City's arguments in connection with the instant applicability of *Heins*.

Review of the appendix indicates the *Heins* issue was *not* pleaded. Likewise, reference to it, by means of pointing out section 441.21, was at best only alluded to during trial. The first time was during the cross-examination of objectors' valuation witness Metier, wherein the following colloquy occurred:

"Q. [By Mr. Haynie]. Now, you understand that the City Assessor is attempting to ascertain fair market value? A. This is my understanding.

"Q. And you also understand that he is enjoined by law to find fair market value of agricultural land in its present use? A. This is my understanding.

"Q. So the assessor is not able by law to consider in addition to valuation which comes about by reason of the change or prospective change of highest and best use of agricultural land? A. Not unless he takes those specific cases that he has taken into court for a determination."

Again, upon the City's cross-examination of objectors' valuation witness Work, the subject matter of the statute was referred to. Work had just stated that he thought highly of the "Assessor's Office" in Des Moines and that " * * * they on the average will come closer to a market value in a community than any other source. I think they should not be ignored."

Haynie immediately asked, "You do recognize that there are certain restrictions imposed by law on the type of market value that assessors can reach with respect to property presently dedicated to agricultural purposes? A. Yes."

■ It becomes evident Haynie was referring to restrictions upon the City Tax Assessor's ability to consider non-agricultural uses in determining market value, in order to demonstrate why tax assessment roles might be unrealistic to show such value. No one during trial asserted section 441.21 in any way was binding upon the valuation committee. Stated simply, this issue was not before the trial court. There was no opportunity for the judge to rule upon it. And for this reason the question of law decided in *Heins* is not properly before this court on appellate review.

III. Objectors contend the procedures followed by the valuation committee were

improper and contrary to provisions of the Iowa Code. There are basically three contentions in this regard: (1) the valuation committee did not consider the value placed upon the real estate by the tax assessor; (2) the committee added to "before" value the cost of a sewer, thus reaching the after value; and (3) the committee's determination of highest and best use was incorrect.

The City counters the city council approved the committee's conclusion, an action which is "legislative and is presumptively correct." It is further argued "once the highest and best use was determined to be something other than its present agricultural use, the tax valuation became wholly irrelevant." The City contends the addition of the cost of the sewer to the before value of the land, "sometimes referred to as the 'anticipated use or development method', is an accepted method of determining value * * *." It is finally argued the "market data approach" was in fact employed by the committee.

As previously noted, the trial court reduced the committee's valuations of the properties of Brown, Hethershaw, Carter, Fischer and Estey. The Resler and Davis valuations remained undisturbed. Calculations indicate the trial court reduced the valuations by approximately 32–33 percent. Yet, the objectors' first issue concerns the methods employed by the committee, whose valuations, obviously, were not totally accepted by the trial court. It would appear to be significant, however, that the trial court's results remained far in excess of tax roll values as well as the Metier and Work valuations. The conclusion follows, then, the committee figures had substantial effect upon the trial court.

At the outset are involved several rules employed by this court time and again in special assessment litigation. While they are clear enough as abstract statements, their application to special fact settings is often difficult.

In any event, "in equity matters, such as this, where our review is de novo it is this court's responsibility to review the facts as well as the law and adjudicate rights anew on those propositions properly presented, provided issues have been raised and error, if any, preserved in the course of the trial court's proceedings. While weight will be given to the findings of the trial court this court will not abdicate its function as triers de novo on appeal. * * * [citing authority]." *Mulford v. City of Iowa Falls*, 221 N.W.2d 261, 267 (Iowa 1974).

In *Goodell v. City of Clinton*, 193 N.W.2d 91, 93 (Iowa 1971), this court consolidated special assessment principles:

"(1) Once a city council has properly ordered a special improvement * * *, there is a presumption of necessity and a presumption, too, that some benefit results to the assessed property owners.

"(2) There is a presumption the amount of the assessment is correct and does not exceed the special benefit accruing from the improvement.

"(3) In considering the benefits flowing from a special improvement, it is proper to consider future uses and expectations as well as present use to which the property is put. [But see *Heins v. City of Cedar Rapids*, supra, 231 N.W.2d 16].

"(4) The burden is on the protesting property owner to show his assessment is excessive by evidence which includes proof of the actual benefit to his property. In the absence of such evidence, the assessment must stand." The opinion cites a multitude of authorities. See also *Mulford v. City of Iowa Falls*, 221 N.W.2d at 268; *Spring Valley Apts. v. City of Cedar Falls*, 225 N.W.2d 129, 131 (Iowa 1975).

The *Goodell* court, furthermore, noted how difficult the instant type of case can be. "Assessment cases cannot be determined with mathematical certainty. The evidence is necessarily based on opinion, some of it made more conjectural because it attempts to project present conditions into the future. These opinions must be taken with those reservations arising from the nature of the case, the self-interest of the witnesses, and the uncertain basis upon which they rest. * * * [citing authority]. We have, on the one hand, city offi-

cials attempting to justify a decision long since made and, on the other, property owners seeking to minimize the taxes they must pay for an improvement they did not want. Recognizing this problem, we have said, 'It is exceedingly difficult to arrive at an assessment in such a case that shall be accurate and just. Approximation is all that can reasonably be expected.' * * * [citing authority]." 193 N.W.2d at 95.

With the foregoing rules and the difficulty of their application in mind, discussion turns to the issues presented. As stated, objectors place considerable reliance upon the fact the committee did not look to tax roll valuations in determining property values. Section 391.48 provides:

"Assessment—rate. When any city council levies any special assessment for any public improvement against any lot, such special assessment shall be in proportion to the special benefits conferred upon the property thereby and not in excess of such benefits. Such assessment shall not exceed twenty-five percent of the actual value of the lot at the time of levy, and the last preceding assessment roll shall be taken as prima-facie evidence of such value."

The weight of the actual value figure reached by a tax assessor is not utterly controlling upon a city council (or its agent, the valuation committee). As stated in *Belknap v. City of Onawa*, 192 Iowa 1383, 1386, 186 N.W. 452, 453, " * * * the preceding assessment roll is only prima facie evidence of the value of the property at the date that such prior assessment was made."

In *Chicago & N. W. Ry. Co. v. Webster City*, 256 Iowa 201, 204, 127 N.W.2d 115, 117, this court noted actual value " * * * can be established by direct testimony such as qualified opinions, similar sales, etc., and also by the production of the last preceding assessment. However, the latter is but prima-facie evidence of such value and it may be overcome. It is not controlling on the question of actual value. * * * [citing *Belknap*]."

Nevertheless, section 391.48 is phrased in terms seemingly requiring at least *some* consideration of assessment roll value. It

"shall be taken as prima facie evidence." Yet during the testimony of committee member Porter, the following colloquy occurred:

"Q. Do I understand then that you gave no consideration to the City Assessor's 27 percent or 100 percent figures with respect to any of the parcels involved here? A. That's correct."

■ It is our view that a city, in determining property value for special assessment purposes, must give at least initial consideration to the value listed on the last preceding assessment roll. Although not determinative of the question, the valuation committee's failure to do so in the present case is a factor to be considered in deciding the weight to be given that committee's valuation.

The calculation methods employed by the committee to reach the value of lands with the sewer in place as well as its determination that the highest and best use was residential are also factors to be considered.

Eugene Porter testified as to committee procedure. A topographical map showing contours of the land and route of the sewer was acquired from the "Engineering Department." Armed with this map, as well as committee members' "day by day knowledge of the real estate business" and sale figures from some "direct comparables within the area," the committee drove over every portion of the land possible. Different values were assigned to lands with different elevations.

Perhaps the most convincing portion of this testimony concerned the three "comparables," consisting of the Higgins-Epstein, Keeney-Grubb, and Fischer (Easter Stores) properties. Thus, it was adduced the Higgins property had sold for $1,500.00 per acre some three years before; the Keeney property for $1,500.00 per acre two years prior; and the Fischer property, which was outside the city limits and adjacent to a lake, was sold in 1966 for $1,565.00 per acre. These figures were considered along with the cost of the sewer to determine after value. It is undisputed the values reached by the com-

mittee were based upon the properties' highest and best use as potential residential development areas.

In addition to their total failure to consider tax roll valuations, the valuation committee did not consider whether certain types of soil were capable of development for residential purposes or generally the difficulties in developing the area. A particular parcel's proximity to the sewer was not considered, except insofar as land adjacent to the sewer line would necessarily be of a lower elevation and thus less valuable. The difficulty or cost of connection with the sewer was apparently not considered in placing a value or in determining the benefits conferred on particular pieces of property. The fact the *cost* of a sewer was simply added to the before value to determine land value after installation must be considered in our review.

A fair reading of the appendix indicates objectors' valuation witnesses, Work and Metier, performed a more detailed study of the Brown and Hethershaw properties. Their appraisals entailed physical inspection of the properties, at least some of which was on foot, the study of maps, comparable sales, topography, ground cover and accessibility. Both men concluded the highest and best use of the properties both before and after installation of the sewer is an agricultural use and that the sewer itself increased land values only slightly. The above table of figures shows the respective values the two men placed upon the lands.

Both witnesses agreed adding the cost of a sewer to the before value of land to reach an after value is an inadequate procedure. Metier employed the example of one constructing a swimming pool in his back yard who then a year later is forced to sell. He contended "the multiple listing cards" prove there is "no way" the seller will get back the cost of the pool. "The cost of something does not denote value." Work, likewise, stated one "cannot take land in transition * * * [and] take the value of the land on this hand and then just automatically add improvements to it and say this increased the value by the value of the

improvements because it has not been so proven yet and you can't prove that value until you sell it."

Metier and Work also disregarded the comparable land sales employed by the City. Metier opined the Grubb, Fischer and Leopold sales were not comparable because of size of these tracts as well as the fact a number of years had passed since these sales. Work, on the other hand, concluded these and other area sales were not comparable on different bases. As to the Grubb sale, Work stated the obvious purpose of the purchase was for future development. While the land actually borders the Brown and Hethershaw tracts, the Grubb land is closer to water, has direct access and is tied into development along Evergreen Avenue. This is also nice, level property. Work said the same held true for the Epstein property. As to the Leopold property, Work discounted it because of trailer court zoning. All these properties were worth several times that of land "back up in the hills."

Both witnesses were rather adamant in their contentions the Brown and Hethershaw tracts were not fit for residential development. The northeast portion of the Brown property is wet and muddy, due to activity of springs, and is "questionable" pasture land. Furthermore, some 83 acres of the southeastern portion form an oak forest. Work concluded no knowledgeable developer would "de-water" and clear this land, until the thousands of acres of better property on the south side had been developed, stating, "I mean, you just don't deliberately buy a headache."

Access problems inhere in the Brown and Hethershaw tracts. Park Avenue is not a through street, although a private portion of it services the Hethershaw house and buildings. Hartford Avenue is apparently also a poor road, especially in the winter. The effect of all this is that the two properties will be the last to be developed, as development at any rate will be from the west to east. In order for the Hethershaw land to gain adequate access, the Grubb (to the west) and Fischer (to the south) properties will have to be developed first. Thus,

the present conditions will necessitate sitting on one's investment for possibly decades.

It is apparent the foregoing factors affected the appraisers' conclusion the lands receive minimal benefit from the sewer. Portions are not benefited at all. Some 21 acres of the Hethershaw land are not served by the sewer and interconnection with it would be extremely difficult. Then there is the wet soil on the Brown property.

In connection with their highest and best use determinations, Work and Metier agreed the previously mentioned cutoff of new gas service to residential areas precludes residential development. One noted his personal difficulty in selling homes with oil heat. Metier knew of no builder constructing homes on platted land not serviced by gas. This factor, of obvious importance, was admitted into evidence. In fairness to the committee, however, it should be pointed out the tariff restricting gas service extension had not been filed at the time the values were determined.

Finally, it was adduced the committee's land valuations would necessitate construction of $35,000.00 to $50,000.00 homes. At the time of the hearing there were no homes in this bracket in the area, and Metier concluded there would be no market for such expensive homes.

The City held to its contention the area is best suited for residential development. Nevertheless, it is difficult not to notice little was done to controvert objectors' evidence. Consideration of the entire record de novo leads to the conclusion the City's arguments are not persuasive.

 The burden is on the objectors to overcome the presumption that the assessment against their properties is correct as made. *Spring Valley Apts. v. City of Cedar Falls*, 225 N.W.2d at 131 and authorities

cited. In light of this presumption correctness of the assessments against the objectors' properties must stand until contradicted by some other evidence. The objectors who are appellants in this matter denied correctness of the assessments and through cross-examination of the City's valuation witness introduced evidence in contradiction which in our opinion was sufficient to support a finding contrary to the presumed fact. Thus, these objectors sustained their burden of overcoming the presumption. See rule 301(a), Uniform Rules of Evidence (1974).

From our de novo review we conclude the assessments as made by the trial court as against the properties of Marian Brown and Cecilia Brown Franklin; Ethmer S. Carter and Grace M. Carter; Wilbur W. Davis and Virginia P. Davis; and G. H. Resler and Ida A. Resler; and the Estate of Carrie Hethershaw, deceased, who are objectors and appellants in this matter, are excessive due to the methods employed by the valuation committee in arriving at the valuations placed on their properties. As to those objectors the matter is reversed and remanded to the district court with directions to enter an order directing the city solicitor to take the necessary steps to reassess their properties in accordance with law. Section 417.37, The Code, 1973.

The case is therefore

Reversed and remanded with directions on objectors' appeal; and affirmed on the City's cross-appeal.