CITY OF CLIVE, Appellant,

v.

IOWA CONCRETE BLOCK & MATERI-
AL COMPANY; E. Stephen Grask; Or-
ville E. Crowley; Chicago, Milwaukee,
St. Paul and Pacific Railroad Company;
Bjornsen     Investment     Corporation;
Pittsburgh–Des Moines Steel Company;
and all Unknown Individuals and Corpo-
rations Having or Claiming an Interest
in the Real Property to be Assessed as
Part of the Construction of the 100th
Street Improvement Program, 1979, Ap-
pellees.

No. 64221.

Supreme Court of Iowa.

Nov. 12, 1980.
Rehearing Denied Dec. 11, 1980.

Keith E. Luchtel of Nyemaster, Goode, McLauglin, Emery & O'Brien, Des Moines, for appellant.

Francis H. Becker of Patterson, Lorentzen, Duffield, Timmons, Irish & Becker, Des Moines, for appellees Iowa Concrete Block & Material Co. and Pittsburgh–Des Moines Steel Co.

Bertrand E. Gionet, Des Moines, for appellees E. Stephen Grask and Orville E. Crowley.

Considered by REYNOLDSON, C. J., and LeGRAND, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

McGIVERIN, Justice.

This appeal involves an attempt by plaintiff City of Clive to levy special assessments, sections 384.37–.79, The Code 1979, against defendant property owners to pay the cost of turning a two–lane, gravel road into a four-lane, paved street. In January 1979 Clive petitioned the district court in equity under section 384.54 for a decree confirming the assessments. After trial, the court reduced the assessments from a total of $253,002.16 to $30,938.92. Clive appeals. We modify and affirm in part and reverse in part.

This appeal requires us to consider portions of Division IV of chapter 384, The Code, which became effective July 1, 1975, and replaced special assessment chapters 391, 391A and 417, The Code 1973.

In deciding this appeal, it is necessary that we address the following questions:

1. Does section 441.21(1), The Code 1979, which provides a special method for valuing agricultural land based on productivity, net earning capacity, and fair market value as agricultural land, apply to determine if a special assessment exceeds "twenty five percent of the value of the lot" under section 384.62?

2. In an action to confirm by decree the acts of the city council concerning a proposed public improvement, can the district court decide that lots within the boundaries of the assessment district established by the council do not receive any special benefit from a public improvement?

3. Should the amount of the special assessments levied against the lots be reduced because they exceed the special benefits conferred on the property by the improvement and, if so, should the deficiency be assessed against the city?

4. Is defendant Pittsburgh-Des Moines Steel Company entitled to a deferment of the special assessment under section 384.62, The Code 1979, because part of its land subject to the assessment is used and assessed agriculturally?

5. Is a property owner whose special assessment has been deferred under section 384.62 liable for interest during the period of the deferment?

The city council of Clive decided in 1978 to begin the statutory process toward paving N.W. 100th Street from University Boulevard north to Hickman Road, a distance of approximately 1,150 feet. The street is presently a two-lane gravel road running north and south. The improvement will result in a four-lane divided concrete street. The parties agree that Clive followed the proper procedural steps in adopting the resolution of necessity, plans, specifications, plats, and schedule of assessments. Clive drew an assessment district bordered generally by Hickman Road on the north, University Boulevard on the south, and extending 886 feet west of 100th Street and approximately 2600 feet to the east. We have attached a map of the assessment district.

To pay for the project, Clive proposed to assess the cost against twelve parcels or lots owned by defendants on the east and west sides of N.W. 100th Street. Lots 10 and 11, belonging to the Chicago, Milwaukee, St. Paul and Pacific Railroad Company are not involved in this case because of a stay order arising out of the railroad's bankruptcy proceedings. The owner of lot 5, Bjornsen Investment Corporation, did not appear in the district court suit, and therefore is in default. This appeal involves lot 12, belonging to Pittsburgh-Des Moines Steel Company (PDM), lot 9, belonging to Iowa Concrete Block & Material Company (ICBM), and lots 1-4 and 6-8, belonging to E. Stephen Grask and Orville E. Crowley.

PDM's land, lot 12, is the only piece of property on the east side of the portion of 100th Street involved in this case. That entire parcel, approximately seventy-nine acres, is in the assessment district. The property abuts the length of the proposed improvement. Its eastern border is the eastern limit of the assessment district. This property is zoned M-2, heavy industrial.

ICBM's land, lot 9, is on the west side of 100th Street. It consists of approximately ten acres and abuts the southern 472 feet of the proposed improvement. The western border is 886 feet west of the street. Clive placed this entire parcel in the assessment district.

Grask and Crowley's land is north of ICBM's land. The lots are bisected by Hickman Court, a two-lane, east-west street which intersects 100th Street on the east. Lots 1 through 4 are north of Hickman Court with lot 1 abutting 100th Street. Lots 6 through 8 are south of Hickman Court with lot 8 abutting 100th Street. This property as well as that of ICBM is zoned M-1, light industrial.

We turn now to a discussion of the issues presented.

■ I. *Valuation of agricultural land.* When making a special assessment to pay for a public improvement, cities cannot exceed "twenty-five percent of the value of the lot." § 384.62, The Code 1979. To determine whether a special assessment exceeds this limit, section 384.46 directs the city council to value the lot at the "present fair market value of the property with the proposed public improvement completed."

All of ICBM's lot 9 and parts of PDM's lot 12 are presently assessed for purposes of

property taxation as agricultural land. Under the 1979 Code the legislature has provided a special method for valuing agricultural land for purposes of assessing property taxes. The special method takes into account productivity, net earning capacity, and market value based solely on its use for agricultural purposes. § 441.21(1), fifth paragraph, The Code 1979. ICBM and PDM argued, and the trial court agreed, that when their property is valued as agricultural property, the special assessments exceed twenty–five percent of the value of their lots. Partly because it valued these lots as agricultural land, the court greatly reduced the special assessments against lots 9 and 12. Clive contends that it is an error of law to use the special method of valuation of agricultural property in section 441.-21(1) to determine the upper limit of a special assessment under section 384.62. We agree.

The applicability of section 441.21(1) to other parts of the code is covered by section 441.21(3), which states:

3. "Actual value", "taxable value", or "assessed value" as used in other sections of the Code *in relation to assessment of property for taxation* shall mean the valuations as determined by this section; however, other provisions of the Code providing special methods or formulas for assessing or valuing specified property shall remain in effect, but this section shall be applicable to the extent consistent with such provisions....

The emphasized portion was added in 1980. 1980 Session, 68th G.A., ch. 1136, § 3.

PDM, ICBM, and the court relied heavily on *Heins v. City of Cedar Rapids*, 231 N.W.2d 16 (Iowa 1975). In that case, we decided that section 441.21(1), with its special method for valuing agricultural land, should be read into a special assessment statute, section 391.48, The Code 1973, to determine the value of the land. We previously noted that chapter 391, along with other chapters dealing with special assessments, have been replaced since *Heins* by current sections 384.37–.79. 1972 Session, 64th G.A., ch. 1088 § 199. For the reasons

stated below, we conclude that the *Heins* case does not control here and therefore the special method for valuing farmland in section 441.21(1) does not apply in valuing land subject to a special assessment under section 384.46 and in computing the upper limit of the special assessment under section 384.62.

At the time of the *Heins* decision, section 391.48, The Code 1973, stated that special assessments, "shall not exceed twenty–five percent of the *actual value* of the lot at the time of levy ...." (emphasis added) We decided that because section 441.21(1), The Code 1973 (currently section 441.21(3)), stated that it applied to determine value wherever the words "actual value" were used in the code, and because section 391.48 used the words "actual value," section 441.21(1) applied to determine "actual value" under section 391.48. *Heins*, 231 N.W.2d at 18.

The problem with using this part of the *Heins* decision under the current special assessment statute is that sections 384.46 and .62 do not contain the words "actual value." Section 384.46 directs councils to value land subject to a special assessment at "the present fair market value of the property with the proposed public improvement completed." Section 384.62 puts the limit of a special assessment at "twenty–five percent of the value of the lot." Therefore, the command of section 441.21(3) to use section 441.21(1) to value land wherever the words "actual value" are used does not result in using section 441.21(1) in the current special assessment statutes.

Another basis for the *Heins* decision involved an analysis of whether the special assessment statute had its own special method or formula for valuing land. Under section 441.21(3), the methods of valuation in section 441.21(1) do not apply if other code sections have "special methods or formulas for assessing or valuing specified property." The *Heins* court decided that the special assessment statute at issue there, section 391.48, did not have any special formula and therefore the valuation methods of section 441.21(1) could be used. In contrast, we conclude that the current

special assessment statute, section 384.46, does provide a special formula for valuing land, which precludes the use of the methods of section 441.21(1). The "special method" in section 384.46 is a valuation based on "the present fair market value of the property with the proposed public improvement completed." This method in substance directs the council to determine what a willing buyer would pay, and a willing seller would accept, for the land when the public improvement is finished. If we were to hold that section 441.21(1) applies, with its valuation based solely on the land being used as agricultural land, we might fail to value the land with the improvement completed. We assume that many public improvements such as streets, sewers, lighting, parking facilities, and driveway approaches, would not enhance the value of the land if the council can only value the land for use for agricultural purposes. To fully follow the direction of section 384.46 to value the land as if the public improvement were completed, we decline to read section 441.21(1) into it.

Finally, we make our own determination whether public policy would be served by reading section 441.21(1) into section 384.46. Section 441.21(1) provides special methods for valuing farmland to help keep property taxes down. If land used agriculturally had a higher and better use, its value would be higher for that use rather than for farming and people holding agricultural land would consequently face higher property taxes. To keep property taxes down, the land is valued solely for use as agricultural land. Similarly, if land subject to a special assessment is valued solely for use as agricultural land, the value of the land, and consequently the limit of the special assessment, might be lower. Arguably, therefore, valuing land subject to a special assessment as agricultural land might assist in keeping special assessments against such property down.

Our review of the current special assessment statute leads us to conclude the legislature believed that persons owning agricultural land do not need their land valued at anything other than its highest and best use to protect them from higher special assessments. The legislature apparently intended all land in the assessment district to be valued at its highest and best use and devised other methods to protect owners of agricultural land. Under the current special assessment statute, unlike its predecessors, owners of agricultural land may defer paying a special assessment as long as the land is used and assessed as agricultural land. § 384.62. With this statute in effect, the legislature apparently thought that owners of agricultural land did not also need an artificially low valuation of their property to protect them from higher special assessments.

We hold that the court erred in valuing the parcels of ICBM and PDM as agricultural land under section 441.21(1) for the purposes of determining the special assessment limit under section 384.62.

Even though we conclude that the trial court has improperly valued these lots, we find it unnecessary to exactly value them to decide this appeal. The only reason for valuing a lot at "the present fair market value of the property with the proposed public improvement completed," section 384.46, is to determine if the assessment exceeds "twenty-five percent of the value of the lot" under section 384.62. The limitation established by section 384.62 is not, however, the only limitation on special assessments. Under section 384.61, special assessments also may not exceed "special benefits conferred upon the property" by the project. Special assessments, therefore, cannot exceed the lesser of these two limits.

Using Clive's figures (which are not seriously challenged by ICBM and PDM because they concentrated their evidence on the amounts of special benefits under section 384.61), twenty-five percent of the value of PDM's lot is approximately $500,000. Twenty five percent of ICBM's lot is approximately $50,000. We conclude in division III that the special benefits to these lots are substantially below these figures. Therefore, the appropriate limitation on special assessments for this case is section

384.61 (assessment may not exceed special benefits) rather than section 384.62 (assessment may not exceed twenty–five percent of value). This conclusion makes it unnecessary for us to put exact valuations on the properties.

■ II. *Conclusiveness of council's determination of lots specially benefited.* One of the decisions made by a city council in making special assessments is a determination of the property that receives special benefit from the improvement. §§ 384.-42(2)(d), .45(1), .48, .49. The council's decision on which lots are specially benefited takes place after published and mailed notice to property owners and a hearing. §§ 384.50, .51. The decision, in the form of a resolution of necessity, requires a vote of three–fourths of the members of the council. § 384.51. If a remonstrance has been filed, a unanimous vote of the council is needed. *Id.* In this case, the court concluded that Clive had erroneously determined that some parcels, or parts of them, received special benefit from the paving when in the trial court's view they were not specially benefited at all. The court therefore decided that the city had violated section 384.61 (assessment may not exceed special benefits conferred upon the property). The court further decided that any special benefit only extended 400 feet east and west of 100th Street into parcels 9 and 12. Also, the trial court decided that lots 3, 4, and 6, belonging to Grask and Crowley, did not receive any special benefit and therefore could not be subject to any special assessment. Clive contends that the court erred as a matter of law is redetermining which lots were specially benefited. We agree.

We note that the only issue for discussion in this division is whether a court can review the city council's legislative determination that a piece of property within the boundaries of the assessment district receives special benefit from a public improvement project. All parties agree that the trial court can properly review the amount of special assessments. §§ 384.-54(7) (court in confirmation action may correct irregularities or inequalities in schedule of assessments, which includes amount of special assessment), .66(2) (property owner may petition for review of amount of assessment). The question is whether the trial court can make its own judgment that a piece of property does not receive any benefit.

In asserting that as a matter of law the court erred in deciding that some lots or parts of lots did not receive any special benefit, Clive relies heavily on section 384.-51. Section 384.51 states in part, "The adoption of a resolution of necessity is a legislative determination that the improvement is expedient and proper and *that property assessed will be specially benefited thereby and this determination of the council is conclusive.*" (emphasis added) According to Clive, this means that once the city draws the assessment district boundary, there is only review of the amount of the assessment and the trial court cannot redetermine that property in the district is not specially benefited at all. We agree, unless the city council has acted unconstitutionally.

While previous special assessment statutes provided for resolutions of necessity, none of them contained language purporting to make the resolution of necessity a legislative determination that conclusively established the lots specially benefited. The language first appeared in the original bill, H. F. 574, that was enacted in 1972 and codified as section 384.51. 1972 Session, 64th G.A., ch. 1088, § 132. This is the first time this court has had the opportunity to consider its meaning. We conclude that it means what it says and therefore the trial court erred in reviewing the council's determination that property within the assessment district was benefited by the project.

It is generally accepted that conclusive means final, decisive, irrefutable. *State v. Brandenberger,* 151 Iowa 197, 210, 130 N.W. 1065, 1070 (1911) (conclusive in its legal sense means irrefutable, not capable of contradiction); Black's Law Dictionary 263 (5th ed. 1979). Some of our decisions support our conclusion that the determination

of the necessity of a project and which lots are specially benefited is ordinarily a matter for the city council. *E. g. Persinger v. City of Sioux City*, 257 Iowa 727, 729, 133 N.W.2d 110, 111 (1965) (council's decision that property abutting improvement is benefited "cannot be set aside in judicial proceeding."). If the legislature wanted courts to review whether property within an assessment district receives any special benefit, it would have provided for review. The legislature knows how to provide review of determinations that would otherwise be final, § 384.54(13) (decision of trial court in confirmation action is conclusive unless appeal taken under section 384.54(10)).

A. *Assessment cancellation argument.* Defendants point to section 384.54(15) to support their argument that trial courts are able to conclude that a piece of property within the assessment district is not specially benefited. Section 384.54(15) covers a situation where the court has canceled a special assessment. They assert that one of the times for cancellation contemplated by the legislature is when the court decides that the property is not specially benefited. We disagree. The purpose of section 384.-54(15) is to enable courts that have reduced or canceled assessments to assess the resulting deficiencies against the city or other property owners in the assessment district. That statute says nothing about when an assessment may be canceled. We assume that the legislature contemplated cancellation of a special assessment if procedures leading up to an assessment were not followed by the council or if fraud were involved. §§ 384.54(7), .66(1), (3). To say that a provision for cancellation of assessments means that assessments may be canceled because there is not any special benefit ignores the clear language of section 384.51. We attempt to give meaning to all provisions of a statute if possible. *Robinson v. Department of Transportation*, 296 N.W.2d 809, 811 (Iowa 1980); *Rohret v. State Farm Mutual Automobile Insurance Co.*, 276 N.W.2d 418, 420 (Iowa 1979).

B. *Constitutional attacks.* Grask and Crowley also claim that section 384.51,

and the council's action in this case, are a denial of substantive due process and equal protection. U.S.Const. amend. XIV, § 1; Iowa Const. art. I, §§ 6, 9. The burden is on the challenger to prove that a statute is unconstitutional. *Gleason v. Davenport*, 275 N.W.2d 431, 434 (Iowa 1979). We find no merit to their arguments on the present record. While we conclude that the statute is constitutional on its face and as applied in this specific factual situation, other property owners in other cases are free to challenge the constitutionality of a council's determination of the property specially benefited. *See In re Lewis*, 257 N.W.2d 505, 510 (Iowa 1977).

Section 384.51 allows the city council to conclusively establish the boundaries of the assessment district. It is well established that the legislative determination of the boundaries of the assessment district is not subject to constitutional attack as a violation of due process or equal protection unless the council's action is palpably arbitrary or irrational. *Kansas City Southern Railway Co. v. Road Improvement District No. 3*, 266 U.S. 379, 386, 45 S.Ct. 136, 139, 69 L.Ed. 335, 341 (1924); *Houck v. Little River Drainage District*, 239 U.S. 254, 262, 36 S.Ct. 58, 60, 60 L.Ed. 266, 273 (1915); *Hibben v. Smith*, 191 U.S. 310, 325, 24 S.Ct. 88, 92, 48 L.Ed. 195, 201 (1903); *Coryn v. City of Moline*, 71 Ill.2d 194, 202, 15 Ill.Dec. 776, 779, 374 N.E.2d 211, 214 (1978); *Robert T. Foley Co. v. Washington Suburban Sanitary Commission*, 283 Md. 140, 149, 389 A.2d 350, 356 (1978); *Wing v. City of Eugene*, 249 Or. 367, 372, 437 P.2d 836, 838 (1968). Section 384.51 is merely a recognition by the legislature that absent palpably arbitrary or irrational action, which is not evident here, the determination of the boundaries of the assessment district is a legislative decision for the council. Courts have no authority to decide whether the council acted wisely in adopting the resolution of necessity "merely because it is or is not to our liking." *Davenport Water Co. v. Iowa State Commerce Commission*, 190 N.W.2d 583, 592 (Iowa 1971). Section 384.51 limits courts to a review of the constitutionality of the council's decision and precludes courts from ask-

ing whether, if they were city council members, they would have drawn the same boundaries.

Grask and Crowley also argue that a special assessment that exceeds the special benefit to the property and is used to pay for benefits enjoyed by the community is an unconstitutional taking. U.S.Const. amend. V. In view of our decision in division III that under *Goodell v. City of Clinton*, 193 N.W.2d 91 (Iowa 1971) a city may not use special assessments to pay for projects generally benefiting the community, we do not need to reach this constitutional question.

### C. *Other considerations.*

Both parties cite decisions of this court that seem to give different answers to the question of whether the council's determination that a lot is specially benefited is final. We agree that the case law in this area is less than uniform. We decline to review these authorities in light of the legislature's decision to make the council's determination of the area specially benefited conclusive. While, as a practical matter, the conclusiveness of the determination of the property specially benefited is of limited effect when a court can review the amount of the assessment, the trial court did err as a matter of law when it decided that in its judgment some lots or parts of lots, did not receive any special benefit.

Nothing we have said in this division should limit exhaustive review by district courts of the amount of special assessments. Property owners need to be protected from overzealous attempts by the cities to levy special assessments. Under the special assessment statutes as currently written, however, courts cannot review the council's determination of which lots are specially benefited, unless the council has acted unconstitutionally by drawing palpably arbitrary or irrational boundaries.

III. *Review of amounts of special assessments.* While the legislature did not allow courts to decide that lots in the assessment district are totally without special benefit, it has provided for review by the court of the amount of the assessment.

§§ 384.54(7), .66(2). Appeal from the confirmation decree is taken as in other equity cases, which means that our review is de novo. § 384.54(10), Iowa R.App.P. 4.

■ In challenging the amount of a special assessment the burden is on the property owner to show that "the assessment is excessive by evidence which includes proof of the actual benefit to his property. In the absence of such evidence, the assessment must stand." *Goodell v. City of Clinton*, 193 N.W.2d 91, 93 (Iowa 1971). While property owners often introduce evidence of a specific dollar amount of benefit to prove that the assessment is excessive, *In re Des Moines*, 245 N.W.2d 533, 535–36 (Iowa 1976); *Spring Valley Apartments, Inc. v. City of Cedar Falls*, 225 N.W.2d 129, 131 (Iowa 1975); *Mulford v. City of Iowa Falls*, 221 N.W.2d 261, 264 (Iowa 1974), our cases have not decided that this is the only way to prove an assessment is excessive. *Wharton v. City of Oskaloosa*, 158 N.W.2d 834, 836 (Iowa 1968) (property owners proved assessment excessive even though no witness "put a figure on the actual benefits conferred by the improvements").

■ The parties' arguments center around section 384.61. It provides that the amount of a special assessment may not exceed the amount of special benefits that the property receives from the project. This provision is designed to implement the general theory of a special assessment—property owners who receive some special benefit from a project should pay their share for it. *Goodell*, 193 N.W.2d at 94. Determining how much an improvement specially benefits individual property owners rather than generally benefits others is difficult. *Id.* at 94. It cannot be done with mathematical precision. *Id.* at 95. Approximation is the best we can do. *Id.* Our review of the record indicates that Clive has impermissibly attempted to assess the cost of a project in excess of the special benefits conferred on the property.

Clive's basic position is that the special benefits from this project equal the cost of the project. They say that paving benefits

the property by providing better access to it and by reducing dust and mud. They justify assessing the full four lanes because in the future, after the area is developed for commercial or industrial uses, the property will benefit from four lanes because it will help move increased traffic, including truck traffic, through the area.

While the arguments made by Clive could possible justify assessing the full cost of a project in another case, on the facts of this case we conclude that the amount of the special assessments must be reduced.

In addition to arguments for reduction of the assessments based on facts unique to each lot, which we discuss later, the property owners argue that assessments should be reduced because the project does not give special benefit to them but rather provides general benefit to the community. We agree and accordingly reduce all assessments by at least fifty percent as an across–the–board reduction.

There is abundant evidence to support the conclusion that this project was not designed to primarily benefit adjacent property owners, but rather to begin a major north–south corridor linking major streets and highways. When it is completed, 100th Street, which is 35th Street in West Des Moines, to the south of Clive, will relieve some of the heavy traffic on 86th Street. Clive's 1978 Comprehensive Plan described 100th Street as "a very important link in the overall transportation plan for the Des Moines Metropolitan area." The plan also called it "an important link for the region."

We have recognized before that special assessments should not be used to pay "for those benefits accruing to the community at large." *Goodell*, 193 N.W.2d at 95. While these property owners may benefit some from increased traffic flow once this project is completed, it is inimical to the principles upon which special assessments are based to make them pay the entire cost of a project that is primarily designed to benefit Clive and the citizens of the Des Moines metropolitan area.

There was evidence that the property owners' needs would adequately be served by a two-lane street. Donald Anderson, the consulting engineer responsible for much of the engineering services performed for Clive in connection with this project, opined that a two-lane street would cost seventy five percent of the cost of a four–lane street. Clive argues, therefore, that if we reduce the amount of the assessments, we should only reduce them twenty–five percent. We disagree. Anderson, clearly not a disinterested witness, stated that, "there would be a lot of variables," and that if he was "going to throw a figure out," the "average" of seventy-five percent "would probably be right." This is hardly a statement that in this case the only reasonable reduction in assessments would be twenty–five percent. In an attempt to determine the special benefit to these lots from some paving and the general benefits to the general public, we conclude that the assessments should at least be reduced by fifty percent. We turn now to a discussion of the assessments against specific lots.

Clive proposed to assess $123,929.17 against PDM's parcel 12 which abuts the length of the proposed improvement and extends back approximately 2600 feet to the east from it. The first 880 feet, approximately twenty acres, is leased for use as farmland. The next 440 feet, an area of approximately nine acres, is used as the steel plant site for PDM. There is access to it from Hickman on the north. The part farthest from 100th street, approximately forty eight acres, is also farmed by the tenant farmer.

Clive has attempted to assess approximately 2600 feet back from 100th Street to the east while only assessing property extending back 886 feet to the west. Clive justifies this by saying that all of PDM's land is specially benefited because it is owned by one owner and could be developed along a single theme using 100th Street for access. We conclude that in this case the special benefit to much of PDM's property is lower than Clive contends. PDM introduced testimony that the amount of benefit to PDM's property beyond 400 feet from 100th Street drops off sharply. We agree.

The nine–acre plant site has adequate access via Hickman Road. The land east of the plant site, and farthest from the proposed improvement, is also benefited little by the project. Access to it could presumably also be from Hickman Road by the same entrance to PDM's steel plant. James T. Hayes, Jr., an appraiser, also testified that another entrance from Hickman is possible approximately 500 feet east of the entrance to the plant site. The eastern portion of lot 12 could also be served by University Boulevard on the south. While it is in a rapidly developing area of Clive, it is doubtful that when developed, its value will be enhanced by the remote possibility that it could use 100th Street after crossing through PDM's plant site. We simply fail to see any substantial special benefits accruing to the plant site or the land being farmed east of the plant.

The part of PDM's land east of 100th Street and west of the plant site would be the logical place to find the greatest amount of special benefit from the paving of 100th Street. It abuts 100th Street and is undeveloped. It too, however, has unique features which make the amount of special benefit to it lower than Clive contends. First, the land is below the flood plain. There was testimony that before any buildings may be erected, at least the building site must be filled. While it abuts 100th Street, access to it is limited because of a drainage ditch between the land and 100th Street. Any developer seeking to utilize 100th Street would first have to construct an entrance to the property. Witnesses testified that an entrance would cost between $6,000 and $60,000.

Based on the foregoing review of the evidence and our conclusion that the entire cost of the paving of a future major arterial street cannot be specially assessed, we reduce the original $123,929.17 assessment against PDM's lot 12 to $40,000.

Clive attempted to assess $50,625 against ICBM's parcel 9. Like PDM, ICBM cannot build on the land until it raises the building site above the flood plain. The lot abuts the street and is undeveloped. It could be developed under a single theme with access

through 100th Street. There was testimony that any special benefit drops off sharply between 300 and 500 feet west into this 886 -foot lot. Largely because we conclude Clive has attempted to burden parcel 9 with the cost of an improvement granting general benefits, we reduce the assessment to $18,000.

Clive also attempted to make assessments against lots belonging to Grask and Crowley. Four of these lots are north of Hickman Court and three of them are south of Hickman Court. Hickman Court is a dead end to the west and runs east until it intersects 100th Street. Clive proposed to assess these lots as follows:

1. Lot 1 (abutting 100th Street and north of Hickman Court) — $14,828.34.

2. Lots 2 and 3 (north of Hickman Court) — $5,227.87.

3. Lot 4 (north of Hickman Court) — $5,277.69.

4. Lot 6 (south of Hickman Court) — $4,625.40.

5. Lot 7 (south of Hickman Court) — $4,702.36.

6. Lot 8 (abutting 100th Street and south of Hickman Court) — $11,158.81.

Grask and Crowley's appraiser, Arthur J. Frahm, testified that the lots farthest from 100th Street, lots 3, 4, and 6, did not benefit much from the improvement. He even opined that the lots were adequately served by Hickman Court and access to it by 100th Street in the form of two lanes of gravel was also adequate. While he stated that paving of 100th Street would benefit the lots closest to it, the others were not substantially benefited. Any argument based on the premise that these lots need four lanes of pavement to be serviced by trucks is weakened when we remember that Hickman Court is only two lanes. Largely because Clive has attempted to assess the cost of a major arterial street that results in general benefits, we have determined the following assessments:

Lot 1 — $7400
Lot 2 — $2600
Lot 3 — $2000
Lot 4 — $1000
Lot 6 — $1000
Lot 7 — $2350
Lot 8 — $5500

■ Finally, we face the issue of whether the deficiencies, the difference between the cost of the project and the amount of the assessments, should be assessed against the city or "the other property abutting upon or adjacent to the improvement or in the district assessed" as provided in section 384.-54(15). Section 384.54(15) does enable this court to assess the deficiencies against the city. Since we decide that our assessments equal the special benefits the property owners receive from the project, we decide that all remaining deficiencies should be and are assessed against the city.

IV. *Agricultural deferment.* In 1978, the legislature amended section 384.62 to provide for the deferment of special assessments against property that is used and assessed as agricultural land. 1978 Session, 67th G.A., ch. 1129, § 2. If the owner of agricultural land subject to a special assessment follows the proper procedure under section 384.62, the assessment is not payable until the land is no longer used and assessed as agricultural land.

All of ICBM's parcel 9 is used and assessed as agricultural land. The court granted it a deferment, which Clive does not challenge.

Most of PDM's seventy–nine acre tract is used and assessed as agricultural land. The nine acres of land used as the steel plant are assessed as industrial land. The court also granted PDM a deferment after concluding that Clive could only assess 400 feet into PDM's lot, a portion used and assessed as agricultural land. Clive claims that this was error. We conclude that PDM is entitled to a deferment of all of the special assessment.

Clive says that PDM should not get a deferment because (1) it is a steel company whose property is not "legitimately farmed," (2) portions of lot 12 that are assessed agriculturally are not all used agriculturally and (3) the nine–acre plant site that is not used or assessed agriculturally should disqualify PDM from the deferment.

■ The fact that PDM is a steel company is irrelevant when considering whether the special assessment should be deferred. The statute does not condition the deferment on the occupation of the owner of the land. Under section 384.62 the issue is whether the land subject to the assessment is "used and assessed as agricultural property."

■ Clive's second argument is that we should not grant PDM a deferment because part of the land that is assessed as agricultural land is not used as agricultural land. While PDM leases its land that is assessed as agricultural land to a tenant farmer, parts of that land are untillable. There is a pit in one corner that was dug out to provide fill when PDM built its steel plant. Another area is untillable because it is an old catch basin for a sanitary sewer. Despite these untillable areas, we decline to deny PDM a deferment. Just because land is untillable does not mean it is not "used" agriculturally. The tenant farmer, Arthur Miner, testified that he tilled all the land that he could. This is sufficient to meet the statutory requirement that the property be used agriculturally.

■ The third argument by Clive is that PDM should be denied a deferment because all of its land subject to the assessment is not all assessed as agricultural land. Clive argues that an agricultural deferment can only be claimed where the entire area owned by one person and subject to an assessment is used and assessed as agricultural land. Therefore, according to Clive, the fact that PDM has nine acres of nonagricultural land subject to the assessment disqualifies the other seventy acres from any deferment. We disagree.

Clive argues that in order to get the deferment, section 384.62(4) requires the yearly filing with the city clerk of a statement that "the entire lot subject to such assessment has continued to be and is still used and assessed as agricultural property." Clive says that in view of the nine acre plant site, PDM could never state that its "entire lot" is used and assessed as agricultural land. Clive's argument ignores the

definition of lot. Under section 384.37(5), the word lot includes "part of lot." Therefore, PDM could conceivably file every year stating that its "entire lot," *i. e.* part of lot, is still used and assessed agriculturally. Under our reasoning, an owner of land that is used and assessed agriculturally, who also owns other land in the assessment district that is not agricultural land, could still use the deferment for the amount of the assessment against the agricultural land. This gives maximum protection to agricultural land from burdensome special assessments.

This case raises unique problems because Clive did not apportion the assessment between PDM's agricultural land and its plant site. Clive, while contending that the entire parcel 12 is specially benefited, did not compute the amount of the special assessment against the plant site and the agricultural land east of it. Rather, Clive drew an imaginary "assessment equalization line" 880 feet east of 100th Street and computed an area assessment at 10.4 cents per square foot—the same area assessment used against lots on the west side of 100th Street. The lots on the west side of 100th Street extend back approximately 880 feet from 100th Street. Clive also assessed additional amounts against lots abutting the street. The problem is that by only using the first 880 feet of ·parcel twelve to compute the assessment, we are totally without guidance on how much of the assessment is against PDM's agricultural land, and how much is against its plant site.

In view of Clive's failure to apportion the special assessment against PDM's agricultural land and its plant site, and in view of the fact that Clive's computations of assessments were made solely against land used and assessed agriculturally, and because we agree with Clive that the bulk of the benefit is against PDM's agricultural land west of the plant site, we conclude that the entire assessment should be deferred. While the amount of the special assessment against PDM's plant site, if one had been computed by Clive, would not normally be deferrable, because of the unique situation of this case, the entire assessment is deferred.

We note that under section 384.62(1), a person subject to a special assessment must file a written request for a deferment at or within ten days of the council's hearing on the resolution of necessity. If Clive, or any other city, receives such a request in the future, and the owner has both agricultural and nonagricultural land in the assessment district, it is the responsibility of the city to apportion the assessment against the non-agricultural land.

■ V. *Interest on deferred special assessments.* The trial court concluded that ICBM and PDM should not pay interest on their special assessments during the period of the agricultural deferment. We conclude that the legislature has not provided for interest during a deferment and therefore the court correctly did not provide for interest.

Section 384.62, dealing with deferments, does not provide for any interest on them. The scheme of deferments operates by allowing the city to levy a special assessment against agricultural land, but not make it payable until the land is no longer used and assessed agriculturally. To provide the maximum protection from special assessments against agricultural land, we decline to require interest. Under our view, the legislative purpose of agricultural deferments is to allow a city to do all the work necessary to levy the assessment, and then place a moratorium on collection if agricultural land is involved.

Other provisions of chapter 384 cannot be used to require interest on assessments that have received an agricultural deferment. The other sections apply to require interest on an assessment that, unlike one that is deferred, is payable and has been divided into installments. § 384.60(2), (3). Interest is also provided for installments that are not paid when due. § 384.65(4). None of these provisions directly apply to a deferred

assessment that has been levied but is not payable.

We have considered all contentions made by the parties and either find them without merit or unnecessary to our disposition of the case.

Costs on appeal are taxed one-half to Clive, and one-sixth each to ICBM, PDM, and Grask and Crowley.

The case is modified and affirmed in part and reversed in part.

MODIFIED AND AFFIRMED IN PART; REVERSED IN PART.

N

ASSESSMENT BOUNDARY

PLACE

ASSESSMENT

HICKMAN RD.

PITTSBURGH DES MOINES PLANT

12

DES MOINES

UNIVERSITY BLVD.

RAILROAD

ASSESSMENT EQUALIZATION LINE

882.92'

100th ST.

11

PROPOSED 100 ft
NOW ...

PITTSBURGH

CREEK

1
2
3
4
5

HICKMAN

HICKMAN CT.

6
7
8

CENTURY

SUBDIVISION

9

10

Bowling Alley